IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GLOBAL ENERGY, INC. | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civ. Action No. 1:07-cv-01410 |
| | ) | |
| | ) | |
| CHARLIE McBRIDE ASSOCIATES, INC. | ) | |
|     Defendant. | ) | |

___

### NOTICE OF FILING
___

On October 29, 2007, Arbitrator Judd Kessler issued his final decision in the arbitration proceeding at issue in this case. As Mr. Kessler's decision is relevant to this litigation, we are filing it with the Court.

Dated: November 26, 2007

                                                    Respectfully submitted,

                                                    /s/ Michael R. Charness
                                                    Michael R. Charness
                                                    D.C. Bar No. 289322
                                                    **VINSON & ELKINS L.L.P.**
                                                     1455 Pennsylvania Avenue, N.W.
                                                     Washington, D.C. 20004-1008
                                                     (202) 639-6780
                                                     (202) 879-8980 (facsimile)

                                                     Attorney for Defendant

2

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 26th day of November, 2007, I caused the foregoing NOTICE OF FILING to be filed and served using the Court's ECF system, which will automatically send email notification of such filing to the following attorney of record for the Plaintiff:

Creighton R. Magid, Esq.
Dorsey & Whitney LLP
1050 Connecticut Avenue, NW
Suite 1250
Washington, DC 20036
magid.chip@dorsey.com

                                          /s/ Michael R. Charness
                                          Michael R. Charness

BEFORE THE AMERICAN ARBITRATION ASSOCIATION

| | |
|---|---|
| In the Matter Between<br><br>CHARLIE McBRIDE ASSOCIATES, INC.,<br><br>         Claimants,<br><br>         v.<br><br>LEWIS A. REYNOLDS<br>REYNOLDS FINANCIAL GROUP<br>And HARRY H. GRAVES<br>GLOBAL ENERGY, INC.<br><br>         Respondents. | Case No. 16 145 00824 06 |

## AWARD

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the arbitration agreement entered into between the above-named parties and dated October 20, 2005, and having been duly sworn, and having duly heard the proofs and allegations of the Parties, do hereby, AWARD, as follows:

      This matter involves a claim brought by Charlie McBride Associates, Inc. (hereafter "CMA") against Reynolds Financial Group LLC, a Florida investment bank ("Reynolds") and Global Energy, Inc., a corporation organized under the laws of the State of Ohio ("Global") for $80,000 plus $730.68 in accrued expenses, representing the balance due under a six-month consulting agreement dated October 20, 2005 (hereafter "Letter Agreement"). This Letter Agreement described services to be provided by CMA to assist GR Development, Inc. (represented to be a joint venture of Global and Reynolds) or its assignee or designee . . . .

      The agreement contains an arbitration clause as follows:

           This letter constitutes a binding contract, enforceable in accordance with its terms under the laws of the District of Columbia in accordance with the rules of the American Arbitration Association, by a single arbitrator located in the District of Columbia. Such arbitrator shall be agreed to by the parties, or, if they cannot reach such agreement, by a single arbitrator selected by the American Arbitration Association of the District of Columbia.

The final paragraph of the Letter Agreement states as follows: "Please indicate your agreement by executing on behalf of Reynolds Financial Group and Global below and returning a copy to me." The Agreement was signed by Charles McBride for CMA and accepted by Lewis A. Reynolds, President & CEO of Reynolds. The Agreement was not signed by an official of Global. Both Global and Reynolds were properly notified of the claim of CMA brought pursuant to the arbitration clause and the Letter Agreement, but Reynolds has never appeared in response to said notice.[1]

At a preliminary hearing conducted by conference call on March 5, 2007, Respondent Global objected that it had not signed the Letter Agreement and therefore, was not a proper party to the proceeding. It was agreed that this threshold issue had to be resolved before anything further could happen in the case, and the parties each prepared two rounds of briefs related to the issue of jurisdiction.

**Ruling on Jurisdiction**

On May 7, I issued a Ruling on Jurisdiction pursuant to Rule R-7 of the AAA Commercial Arbitration Rules, which provides that an arbitrator is empowered to rule on his own jurisdiction, "including any objections with respect of the existence, scope, or validity of the Arbitration Agreement." I had received as attachments to the briefs, copies of correspondence and other documents which, on their face, appeared to reflect the knowledge of and participation by Global in a joint venture with Reynolds. These documents indicated that Global's President, Harry Graves, was aware of the arrangement with CMA and had participated in discussions/negotiations with McBride – without ever disavowing or distancing himself or Global from CMA's efforts. Based on these documents and related argumentation and responses, and having determined that the laws of the District of Columbia recognize the possibility that a joint venture may be created *de facto* (i.e., without formation of a separate legal entity),[2] I found that Global was a proper party to this matter. In so ruling, I stated the following: "I wish to make clear to both parties that a ruling on jurisdiction does not, for a number of reasons, constitute a ruling on the merits of the case. This ruling is limited to the scope of my authority pursuant to Rule R-7 regarding the 'existence, scope or validity of the Arbitration Agreement.'" It was my purpose in making these statements, to make known to the parties that while there was sufficient prima facie evidence to support a finding that Global was a proper party to this matter, the evidence on which this ruling was based was open to being challenged in the hearing. The door was left wide open for Global to present its evidence more fully and to try to undercut the credibility of the witnesses and documents relied on by the Claimant. It was free to do this while reserving it's position on lack of jurisdiction, which it had raised in a timely manner.

---

[1] After my initial ruling on jurisdiction and prior to the hearing, further efforts were made by the Claimant to notify Reynolds at a new address. Though the notice was delivered, no response was forthcoming.

[2] Jonathan Woodner v. Lanter, 531 A.2d 280, 285 n.7, 286 (D.C. 1987); Coles v. Redskin Realty Co., 184 A.2d 923, 926 (D.C. 1962).

**Final Hearing**

A hearing on the merits was scheduled for the afternoon of August 23. CMA and Global were both ably represented by counsel. Reynolds did not appear. CMA presented one witness, Mr. McBride, who was subjected to several rounds of cross-examination, redirect, re-cross, etc. At the end of Mr. McBride's testimony, counsel for Global argued that the case must be dismissed for lack of jurisdiction. This request was denied.[3] It was further noted that Global had not seen fit to present the testimony of its President, Harry Graves, concerning his degree of knowledge or involvement in the dealings with CMA and to allow the arbitrator to appraise his credibility.

**Testimony of Mr. McBride**

The sole witness, Charlie McBride, testified that after graduating from Louisiana State University, he had worked on Capitol Hill with Senator Russell Long and had subsequently become Chief of Staff for Senator Bennett Johnston, as well as Chief of Staff of the National Democratic Campaign Committee. As often occurs in Washington, he later made use of this experience, and the relationships gathered, to open CMA, a general lobbying practice. He first met Lewis Reynolds in the Fall of 2005 and began discussing with him the possible development of a coal gasification/liquefaction facility using Montana or other western coal to provide fuel to the U.S. Air Force or other agencies of the U.S. Government. In these conversations, it was made clear that the expertise in coal gasification/liquefaction did not reside in Reynolds, but rather was possessed by its "joint venture partner Global Energy, Inc."

These discussions led to the Letter Agreement. While Global did not sign the Letter Agreement, its name appears prominently in several places. The Letter Agreement provided that CMA would be compensated in the amount of $20,000 per month for six months plus "ordinary out-of-pocket expenses incurred by CMA." In addition, it was agreed that upon financial close of the contemplated energy project as described above, CMA would receive a success fee of $2.5 million.

The first monthly retainer amount was paid in a timely fashion by Reynolds. CMA began work, focusing on obtaining the involvement of Senator Conrad Burns of Montana, a senior Senator on the Appropriations Committee and also a member of another Senate committee related to Defense. In late November/early December, a White Paper was prepared with involvement of several persons which, in part, describes a special purpose corporation now referred to as Defense Fuels, Inc. ("DFI"). The largest shareholder of DFI was said to be Global, with the remaining shares held by executives of the Reynolds Financial Group. The principal purpose of the White Paper, apparently, was to outline a proposal for $1.5-$2 billion coal gasification to liquid fuel plant, which would sell the fuel to the Air Force. This White Paper was used in a meeting with Senator Burns on December 15, which was attended by both Lewis Reynolds and Harry Graves, the President of Global.

---

[3] Only days before the hearing, counsel for Global filed an action in the U.S. District Court for the District of Columbia requesting a stay of the Arbitration proceedings pursuant to a temporary restraining order. This request was denied by the court on several grounds but particularly, on the ground that there had been no showing of potential irreparable harm.

Graves and Reynolds were introduced to Senator Burns and his staff as the principals of the DFI Team. Harry Graves participated actively. Graves did not object to or comment on the characterization of DFI as a joint venture of Global and Reynolds, either at that meeting or in subsequent discussions with McBride.

McBride then set up a follow-on meeting at Burns' offices with 8-10 Department of Defense officials. Exhibits introduced during McBride's testimony also included a subsequent letter from Senator Burns dated January 23, which referred to DFI as a special purpose corporation established by its shareholders, Global Energy, Inc., and the Reynolds Financial Group, together with an e-mail from Reynolds to Graves enclosing a copy of the said letter. Nothing was introduced to indicate that Graves objected in any way to the content of the January 23 letter.

On or about March 16, McBride testified to having spoken with Graves about the failure to make payment of the second retainer amount. Apparently, Reynolds could not or would not make payment of the second month of retainer and had encouraged McBride to contact Graves directly. McBride testified that Graves, at first, asked that the last four months of the retainer be made contingent. When that suggestion was rejected, McBride agreed that if prompt payment was made of the second month's retainer, he would give positive consideration to accepting the remaining four payments after 120 days. These exchanges are confirmed in the e-mail exchanges between McBride and Graves presented as Claimant's Exhibit 7.

McBride testified that in the course of conversations with Graves about payment for the services agreed upon in the Letter Agreement, Graves had never objected that McBride was talking to the wrong man or the wrong company. Further, there is no evidence in the written documents presented by either party that Graves ever made any objection to the nature or quality of McBride's work prior to CMA's filing of the claim in this matter. On the contrary, the evidence seems to indicate that Graves was quite satisfied with McBride's work and was apparently seeking a way to get him to continue – but still minimizing or delaying upfront cash payments.

Both the quality and quantity of work performed by McBride were topics involved in the cross-examination of McBride by Global's counsel, which was careful and thorough. Though it called into question Mr. McBride's memory of certain facts and raised questions about the reasonableness of the amounts charged for work done, the factual history of the relationship as outlined by Mr. McBride was not seriously called into question. I found McBride to be a careful and credible witness.

As indicated above, Global, despite having the same opportunity as Claimant, declined to present testimony by Graves or any other witness. It did, however, introduce a number of written exhibits which were used in cross-examination.

**Analysis**

As I understand the evidence presented, the underlying storyline of this case is a familiar one which is repeated hundreds if not thousands of times in Washington every year. One party with access to financing and perhaps some political influence joins together with another party

whose strength is in the technical/substantive side of a complex business. Through a joint effort whose terms are set forth with greater or lesser formality, they seek to make use of the resources of the Federal Government to create a profitable project or enterprise. It is capitalism Washington-style.

In this process, people like Charlie McBride, who have spent the majority of their careers fostering relationships with key political figures, often sell their services for amounts which are objects of envy for other consultants. This occurs because people do not hire lobbyists for normal analytical and writing skills. They hire them because they are able to use established relationships to get meetings with and to influence decisions by senators or congressmen which may benefit their clients. Clearly, the Letter Agreement with CMA was entered into for such reasons. The evidence indicates that though CMA's "hourly rate" may have turned out to have been fairly impressive, the Letter Agreement was entered into by sophisticated businessmen, and CMA was able to perform as agreed -- by arranging an initial meeting with Senator Burns, and then a subsequent meeting at the Senator's office in which he was able to involve 8-10 officials of the Department of Defense interested in his client's project. This was followed by a subsequent letter from Senator Burns to Kenneth Krieg, Undersecretary of Defense for Acquisition, Technology and Logistics. It appears from the testimony and exhibits that McBride was doing precisely what the Letter Agreement called for. Had other developments fallen into place, his intervention could well have resulted in a $1.5-$2 billion energy project of the sort proposed by Reynolds and Global.

Though Global did not sign the Letter Agreement, the evidence demonstrates that both Reynolds and Global knew what they were trying to accomplish through the services of CMA and that they were trying to accomplish it together. As indicated in my earlier Ruling on Jurisdiction, under the laws of the District of Columbia (as well as other jurisdictions which have enacted the Uniform Partnership Act), a joint venture may be created without the creation of a separate legal entity. A joint venture may be created, *de facto*, when parties join together as partners to pursue a common business goal. Though the names GR Development, Inc. (mentioned in the Letter Agreement) and later DFI, Inc. were apparently nothing more than "d/b/a's," there is ample evidence, both in the testimony of Mr. McBride and in the exhibits presented by the parties (both as attachments to their briefs on the initial jurisdiction and subsequently at the hearing itself), that Global and Reynolds had created such a *de facto* partnership and were pursuing a common business goal.[4] While Global did not sign the Letter Agreement engaging CMA, it strains credulity in light of the evidence presented, that Mr. Graves and Global were not closely involved in the activities called for by the Letter Agreement or that they believed that McBride was somehow offering his services *gratis* or on an "if – come" basis. The failure of Mr. Graves to object, either in e-mail correspondence or according to the testimony of Mr. McBride; in phone conversations, to McBride's demands for payment of his retainer fee makes it difficult to believe that he and Reynolds had not jointly agreed upon the hiring of McBride to attempt to push the project forward.

---

[4] The members of a joint venture are jointly and severally liable for the debts of the venture. D.C. Code Ann. § 33-103.06(a); Beckman v. Farmer, 579 A.2d 681, 640 n.28 (D.C. 1990).

Had Mr. Graves appeared to testify and to subject his version of events to cross-examination, my finding might be different. But he did not and this case must be decided on the evidence before me. His version of events is limited to an affidavit in which he denies that Global ever knew about the Letter Agreement and that he had never authorized Reynolds to sign it. The preponderance of the evidence convinces me otherwise.

I find that the Letter Agreement with CMA formed an element of an agreed business venture between Reynolds and Global. Global clearly knew of CMA's involvement and the details of the payments called for. By his conduct in attempting, on more than one occasion, to renegotiate the contract so that CMA would continue its work, Graves and Global demonstrated, to my satisfaction, that Reynolds had not been acting without Global's knowledge but rather in the service of a joint enterprise.

Having found that Respondent Reynolds Financial, Inc. had engaged CMA on behalf of their joint venture, I find Respondents Reynolds and Global jointly and severally liable for the full amount claimed, $80,730.68. Pursuant to the authority provided by Rule R-45(c), I hereby further determine that the fees and expenses of the arbitration shall be borne 25% by Claimant and 75% by Respondents. To the extent that Claimants have advanced expenses on Global's behalf, such amount shall be added to and incorporated in the award.

Though Claimant has also prayed for attorneys' fees, I find no legal basis to include them in this award. As a result, CMA's claim for attorneys' fees and other relief are DENIED.

The administrative filing and case service fees of the AAA, totaling $2,550.00, shall be borne as follows: 25.00% by Charlies McBride Associates, Inc, and 75% by Respondents. The other administrative fees of the AAA, totaling $150.00, shall be borne as follows: 25.00% by Charlies McBride Associates, Inc, and 75% by Respondents.. The fees and expenses of the arbitrator(s), totaling $16,321.31, shall similarly be borne 25.00% by Charlies McBride Associates, Inc, and 75% by Respondents.

Therefore, Reynolds Financial Group shall reimburse Charlies McBride Associates, Inc the sum of $1,642.92, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Charlies McBride Associates, Inc. Global Energy, Inc. shall reimburse Charlies McBride Associates, Inc the sum of $1,642.91, representing that portion of said fees and expenses in excess of the apportioned costs previously incurred by Charlies McBride Associates, Inc.

This Award is in full settlement of all claims and submitted to this Arbitration. All claims not expressly granted herein are hereby, denied.

10/29/07
Date

Judd L. Kessler

I, Judd L. Kessler, do hereby affirm upon my oath as Arbitrator that I am the individual described in and who executed this instrument which is my Award.

10/29/07
Date

_____
Judd L. Kessler